## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| CODY DELGADO,<br><br>                    Plaintiff,<br><br>          v.<br><br>JAMES SNELL and CITY OF CLYDE,<br><br>                    Defendants. | Case No.   23-cv-844_____<br><br>Judge _____<br><br>**Complaint with Jury Demand** |

### I. Introduction

1.      This case is brought under 42 U.S.C. § 1983 for deprivation of civil rights guaranteed by the U.S. Constitution and under the laws of the State of Ohio against the City of Clyde, Ohio, and one of its police detectives, Detective James Snell, who acting under color of law, unlawfully and maliciously influenced and instituted a felony rape prosecution against Plaintiff Cody Delgado, without probable cause, by destroying, concealing, and falsifying evidence.

2.      A successfully recovered former addict himself, Plaintiff had established himself as a prominent figure in the recovery community in the Sandusky area. He helped hundreds of individuals struggling with drug abuse receive treatment for their addictions through placement in addiction recovery facilities throughout the country. Through his work, Plaintiff contended with the ugly realities of drug abuse and addiction, including lies, relapse, and sometimes even violence. His clients were often dishonest with him; their drug dealers tried to undermine Plaintiff's efforts; and even when Plaintiff was successful in getting others to agree to seek treatment, many would back out at the last minute, abandon treatment early, or relapse back into addiction.

3.      While Plaintiff was used to dealing with these types of challenges in his work, he could not anticipate that one of his competitors, named Richie Webber, would orchestrate false rape

allegations against him by two addicts whom Plaintiff had set out to help, nor that politically motivated police officers would manipulate, destroy, or conceal evidence—including the audio recording of his first meeting with an alleged rape victim who, as Snell tried to conceal at trial, showed up to the interview under the heavy influence of drugs—to try to make those allegations stick.

4.      The prosecution of Plaintiff would never have occurred but for Detective Snell's destruction and concealment of exculpatory evidence, and other intentional misconduct that was designed to ensure that Plaintiff would be prosecuted. After hearing the preposterous testimony of the alleged victims, and the rest of the voluminous evidence establishing Plaintiff's innocence of the charges, the jury acquitted Plaintiff of the charges against him after about 90 minutes of deliberation—which was as much time as it took to choose a foreperson and fill out the verdict forms. That outcome does not however redress or deter the egregious and shocking deprivation of liberty suffered by Plaintiff due to the unwarranted and intentionally corrupted felony proceedings against him. Thus, as alleged herein, Plaintiff is entitled to damages for the egregiously unconstitutional, unlawful, and harmful treatment he endured by state officers who were empowered and sworn to uphold the law.

## II. Jurisdiction and Venue

5.      This Court has federal-question jurisdiction over this action pursuant to 28 U.S.C. § 1331 for the claims raised under 42 U.S.C. § 1983 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for claims raised under Ohio law.

6.      This Court has jurisdiction over Defendants because they are residents or political subdivisions of the State of Ohio.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the acts upon which the claims in this litigation are based and the damages resulting therefrom occurred in Sandusky County, Ohio.

### III. Parties

8.      Plaintiff Cody Delgado is an individual residing in Sandusky County, Ohio.

9.      Defendant James Snell is and was at all relevant times a detective with the City of Clyde,
Ohio Police Department. He is a resident of Erie County. The claims asserted against him herein are
asserted against him in his personal (not official) capacity.

10.     Defendant City of Clyde is a municipal corporation and political subdivision of the State of
Ohio located in Sandusky County.

### IV. Facts

11.     In the years leading up to his indictment, Plaintiff's work involved placing individuals
struggling with drug abuse into addiction recovery facilities. This difficult but rewarding work
required building trust and establishing relationships with people struggling with addiction in order
to convince them to seek treatment. To that end, Plaintiff constantly reached out, engaged with, and
personally interacted with some of the most desperate and neglected members of his community.

12.     Through his recovery work, Plaintiff met Eiriel D. and Mariah W., two women that were
severely addicted to heroin, fentanyl, and other opiates. As with all of his clients, Plaintiff
communicated with these women often and worked diligently to assist them in obtaining treatment
for their addiction. Through his experience, Plaintiff learned that many addicts who initially agree to
seek treatment fail to go through with it for a variety of reasons. Some decide to get high "one last
time," some are manipulated by their drug dealers, others just get cold feet. Therefore, after securing
placement for an addict in a recovery facility, Plaintiff would often stay with the addict until it was
time for them to be admitted. Plaintiff regularly drove his clients to the airport, and depending on
the location, he sometimes drove them directly to the recovery facility.

13.     On or around September 5 of 2017, Plaintiff convinced Mariah to get treatment at a
recovery facility in West Virginia. That day, Mariah came to stay at Plaintiff's residence, which was in
a loft apartment above a 24-hour gym in downtown Clyde.

14.     The next morning, Plaintiff drove Mariah to her home to gather some personal belongings. Then they picked up Mariah's cousin, Troy Heath (whom Delgado had previously successfully aided in recovery), and the three of them drove together to the recovery facility in West Virginia. At no point during these events did Mariah indicate to her cousin, or anyone, that Plaintiff had done anything inappropriate to her. Heath confirmed the same in his testimony at trial.

15.     By late January of 2018, Mariah had gotten the idea to report Plaintiff for raping her during their encounter five months prior. Notably, it was not Mariah who initially reported the alleged rape to Clyde police. Rather, it was Eugene W., who has the same last name as Mariah but is no blood relation, and who is a business partner of Richie Webber, Plaintiff's main rival in the highly competitive Northwest Ohio market for referrals to rehab facilities. On January 25, 2018, Eugene called the Clyde Police department to report that Plaintiff had sexually assaulted not only Mariah, but "may" have also assaulted "two other females from their [recovery] group."

16.     Defendant James Snell, a veteran detective with the City of Clyde, Ohio Police Department, was assigned to investigate Mariah's complaint and took note of this call from Eugene in his report, stating that "Eugene finished that he would encourage the three females to come forward and speak with me but he wasn't sure if any of them wanted to make a formal statement."

17.     Later that same day, Mariah came into the Clyde police station with Eugene to speak with Detective Snell. Snell recorded this interview. In violation of well-established departmental policies, Snell allowed Eugene to sit next to Mariah during the interview and coach her while she was answering questions.

18.     Despite being serially coached by Eugene during this interview, including by having Eugene whisper answers to Snell's questions in her ear (as was captured on the recording of the interview), Mariah was also recorded during this interview stating that Webber told her she would "get money" if she reported Plaintiff for raping her, essentially asking Snell and Eugene when she would get paid. Snell did nothing to follow up on this admission by Mariah of her motivation to lie, despite knowing

that she was severely addicted to opiates, in desperate financial straits, and was also apparently under the influence during this interview.

19.     Not only did Snell's decision to permit Eugene to be in the interview room with Mariah call the credibility of Mariah's testimony into serious question, Eugene's presence in the room also enabled him relay to other potential witnesses what a complaining witness and alleged victim had told Snell, thus enabling witnesses with ulterior motives to align their stories.

20.     Snell did speak with the two other women who were identified in Eugene's initial call as being victims of sexual assault by Plaintiff. Both of these women stated that they engaged in consensual sexual activity with Plaintiff and unequivocally denied that he had assaulted them or otherwise committed any crimes against them.

21.     In the course of his investigation of Mariah's allegations, Snell was also provided with text messages between Mariah and her friend Nathan Longbrake that were exchanged that evening, almost immediately after the alleged rape had happened. In these messages to Longbrake, Mariah said: "Just come here. It's important." And when Longbrake responded that he was on his way, she replied: "Whatever I do or say do not take me anywhere." By this statement, Mariah was plainly communicating her intent to go to rehab as Plaintiff had arranged for her, and that, in her intoxicated state, she did not want to say or do anything that would cause her to leave Plaintiff's custody and jeopardize her trip to the rehab facility.

22.     Shockingly, Snell did not even try to speak with Longbrake about these messages in the course of his investigation, nor did the state call Longbrake as a witness at trial. The defense, however, called Longbrake to testify, where he confirmed that when he arrived to meet Mariah in the parking lot outside of Plaintiff's apartment, she asked him for money, presumably so she could buy more drugs, which, as Longbrake further testified, was a common occurrence. Longbrake also testified that Mariah was not in distress and eventually left without giving her any money because he knew that she would buy drugs with any money he gave her. Longbrake also confirmed at trial that

IF Mariah had indicated that Cody had harmed her or that she was in any distress (again, she did not indicate any such thing to him), he would have given her a ride wherever she wanted, let him stay at her house, or done whatever he could to ensure her safety.

23.     Mariah also told Snell in her interview that she did not in any way resist Plaintiff's alleged attempt to have sex with her, because she was too intoxicated from fentanyl to be able to resist or otherwise indicate her lack of consent to the alleged contact. Snell disregarded the preposterous nature of this testimony given Mariah's admissions, confirmed by Longbrake and his text messages with Mariah, that she repeatedly scaled the steep ladder to Plaintiff's apartment in the loft above the gymnasium, immediately after the alleged rape.

24.     Not only did Snell disregard the preposterous nature of this testimony, he yet again violated well established Clyde PD protocol by failing to even try to secure the footage from the many surveillance cameras that the owner of the building, Troy Keegan, had operational at this well maintained building in the heart of downtown Clyde, which was open to the gym's members at all hours. Snell also failed to obtain any data from the card readers that Keegan had installed to regulate and monitor entry to the building, including entry by gym members who frequented the facility at all hours. Snell knew that there must have been witnesses to this alleged rape victim—who claimed she was too incapacitated by fentanyl to have consented to the alleged sex with Delgado that she admitted she did nothing to resist—somehow mustering the wherewithal to scale this steep ladder in the gym down to meet Longbrake and back up to the apartment within minutes of the alleged rape. Yet he did nothing to even identify, let alone inquire of these witnesses.

25.     Snell also testified at trial that he failed to review or obtain the transcript of sworn testimony that Mariah gave in the Sandusky County Court of Common Pleas in proceedings by which she sought a protective order against Plaintiff in early 2020, just months prior to the April trial on her rape charges, presumably at Snell's instruction. In these proceedings, Mariah gave an account under oath that was entirely contradictory of her recorded statements to Snell, as well as her trial

testimony, including that Plaintiff had trapped her at his apartment for two days, and raped her "more than four" times. It is beyond reasonable belief that a veteran police detective would fail to review such testimony. Thus, it may be readily inferred that Snell did in fact review this testimony and deliberately concealed it.

26.     As the investigation of Mariah's allegations continued into June of 2018, Eugene continued to feed information to the Clyde Police Department about other alleged victims of abuse by Plaintiff.

27.     Indeed, it was Eugene W.—the same person who first reported Plaintiff's alleged rape of Mariah—who also first contacted the Clyde PD with accusations that Plaintiff had raped Eiriel D. This was on June 9, 2018, about five months after Mariah made her allegations.

28.     As with Mariah, Plaintiff had convinced Eiriel to agree to seek treatment for her drug addiction in late May of 2018, arranging for her placement at a recovery facility in California. On or around May 31, 2018, Eiriel came to stay with Plaintiff at his residence, from which he planned to drive her to the airport the next day for her flight to California. However, that night, Eiriel changed her mind about recovery and left Plaintiff's residence. At that time, Eiriel was wearing a GPS monitor as a bond condition from a previous criminal conviction, and the GPS data showed Eiriel standing in front of Plaintiff's residence for some time before moving away at 45 miles per hour. Eiriel was then picked up in a car by her drug dealer, a man named Thad Spencer, known as "Polo," proceeded to barter sex with Polo for drugs, and never followed up with Plaintiff about the reservation and flights he had arranged for her treatment at the California facility.

29.     Before having taken Eiriel to his apartment, Plaintiff had gone with her to her grandmother's house so that Eiriel could pack her bags for her stay in California. Eiriel's grandmother had assisted her in contacting Plaintiff and ensuring her arrangements to go to the California rehab facility. She was understandably upset with Eiriel for not going to the rehab facility as promised, so Eiriel needed an excuse for this failure, and Plaintiff was a convenient scapegoat.

30.     Within two days, by June 2, 2018, Eiriel's grandmother had arranged, through Richie Webber, for Eiriel to stay at a different rehab facility in Florida. Another of Webber's business partners, Christina Rodriguez, gave Eiriel a ride to the Cleveland airport that day from Fremont. It was during this ride that Eiriel's accusations first surfaced that Plaintiff had sexually assaulted her.

31.     In her interview with Snell, which took place on September 6, 2018, Rodriguez confirmed that the only contemporaneous documentary evidence of this alleged assault were text messages that Rodriguez herself typed out on Eiriel's phone to send to her own phone, because, according to Rodriguez, it was important to "document" the accusations. Yet, Rodriguez confirmed in her interview with Snell that in those text messages, and during the ride to the airport, Eiriel did not "indicate that she felt she had been violated in any way."

32.     In this same interview, Rodriguez also informed Snell that she was a business associate of Richie Webber, that Richie was the one who contacted her to take Eiriel to the airport that day, and that "there's a huge thing" where people are "taking sides" with or against the Plaintiff.

33.     By the date of this interview of Rodriguez, Snell had already interviewed Eiriel at the Clyde police department, and during this interview, Snell made the off-handed remark to Rodriguez that Eiriel was intoxicated when she first came in to speak to him and that she had to come back for a second interview.

34.     Snell's first interview with Eiriel took place on August 10, 2018. Pursuant to Clyde PD protocol, this interview was supposed to be a recorded. During the interview, Detective Snell observed that Eiriel was severely intoxicated, but he intentionally omitted that observation from his extensive notes of the interview.

35.     Not only did Snell conceal the fact of Eiriel's intoxication from his report of the interview, he severely compounded this violation by proceeding to destroy the audio recording of the interview, then falsified records to convey the impression that this audio had accidentally gone

missing, and arranged for Eiriel to come back for another interview where she could give different testimony.

36.    At trial, Snell tried to conceal his observation that Eiriel was severely intoxicated during her first interview. He was then impeached by Plaintiff's defense attorney, who had reviewed the entirety of Snell's recorded interview with Christina Rodriguez, where Snell made the remark to Rodriguez that Eiriel was high during her first interview and needed to be brought back for a second one. Surprised to be confronted with this recording on the stand, Snell had no choice but to admit that he told Rodriguez that Eiriel was high during her first interview (the one for which the recording "disappeared"). He also had to admit that he did not disclose this fact in any of his police reports about the incident, including his lengthy account of his interviews with Eiriel.

37.    Snell also had to admit at trial that the recording system at the Clyde police station that he used to record his interviews with Eiriel was new, state of the art, and had never malfunctioned prior to the "disappearance" of the recording of Eiriel's interview.

38.    *In vino veritas* surely also applies to opiates. Eiriel, in her intoxicated state and without realizing she was being recorded, made statements during this interview that wholly undermined her and Mariah's rape allegations against Plaintiff, including admitting that Richie Webber and his associates promised them money for making false rape allegations against Plaintiff, and confirming that Plaintiff did not assault her.

39.    Snell intentionally destroyed the recording of these statements because he knew that they would destroy the case he was trying to build against Plaintiff. Otherwise, Snell would have had no reason to destroy the recording, and would not have taken the risk to have done so.

40.    Even at her second interview, where Eiriel stated that Plaintiff raped her, Eiriel nevertheless undermined her own allegations in a way that was obvious to anyone interested in the truth of the matter, including by stating that after the alleged rape, she ran to a McDonald's over a mile away to escape, where she was picked up by her drug dealer "Polo." Detective Snell knew that Eiriel was

wearing a GPS monitor at the time, but he did not try to obtain the GPS data to corroborate Eiriel's story, which was also against well-established Clyde PD protocol (not to mention basic common sense). The GPS data, which showed Eiriel moving at 45 miles per hour for an extended time and distance toward this McDonald's, would have confirmed that Eiriel was lying. A representative of the corporation that tracked the GPS monitor testified at trial to confirm the same, and also testified not only that Snell never tried to contact her, but that this was the first time in her lengthy career that she was called to testify by the defense and not the prosecution.

41.    Eiriel also confirmed to Snell in her second pre-trial interview that, after she left Plaintiff's apartment after the alleged rape, that she was shortly picked up by Polo, who was known by Snell to have been a drug dealer and has been prosecuted and convicted multiple times for trafficking, including felonies. In fact, Snell even interviewed Polo while he was incarcerated. Yet, purportedly, the possibility did not occur to Snell that Eiriel, severely addicted to heroin, had left Plaintiff's custody that night not because Plaintiff had done anything wrong to her, but rather that she simply wanted to get drugs from her dealer.

42.    Additionally, as with his failure in investigating Mariah's allegations, to secure the surveillance footage from the 24-hour gym above which these alleged rapes allegedly took place, Snell again failed to secure footage that would have captured Eiriel in her claimed state of distress, "running away" from Plaintiff's apartment to alleged safety with Polo, the drug dealer, including by scaling the steep ladder down from Delgado's apartment in her admittedly intoxicated state. Snell also, again, failed to ask for the data from the key card system installed by the building's owner, that would have identified eyewitnesses to these alleged events.

43.    Yet even worse, to compound these errors, and also to confirm their intentional nature, Snell falsified his official report of these rapes by stating that he "spoke with the owner of [the gymnasium above which Plaintiff lived], Troy Keegan, over the phone," and that "Keegan confirmed that he has security cameras inside his business but that the recordings roll off after approx. two days." Keegan,

who himself is a former Clyde police officer, was called by the defense to testify at Plaintiff's trial, where he confirmed that Snell misrepresented this conversation. The truth, according to Keegan's trial testimony, was that Keegan would have been able to recover this footage, and the key card data, but Snell never asked him to.

44.     In his investigation, Snell was also directly informed by witnesses that Richie Webber had put Mariah and Eiriel up to lying about the Plaintiff in order to crush his business rival. Michael Pack, another member of the local recovery community, provided Snell a statement that several women had stated that Webber "put them up to saying [Plaintiff] raped or sexually assaulted them and the accusations are totally false." According to Snell's report, Pack informed him "that there was bad blood and competition between [Plaintiff] and Richie Webber in the area for most referrals, making names for themselves, etc." Snell's report further notes Pack's allegation "that Webber had paid girls to make false allegations against [Plaintiff] as part of this continued 'beef' between them." Further underscoring his malicious intent, Snell deliberately disregarded this evidence as well, even despite that Mariah told him in his recorded interview of her that Webber told her she would "get money" if she reported Plaintiff for raping her, and even despite that Eiriel's inconsistent, shifting, and physically impossible story about her alleged rape was handed to him by Webber's known business partners as well.

45.     Despite the obvious lack of credibility of both Eiriel's and Mariah's accusations, Snell referred the case for prosecution based on their wholly uncorroborated, contradictory, and plainly falsified accounts. Snell indeed was well aware of the wholly uncorroborated, contradictory, and falsified nature of Plaintiff's accusers, and—apparently motivated by his own political beliefs or personal moral beliefs about Plaintiff's conduct, and/or the advancement of his career—Snell manipulated, falsified, and destroyed evidence to make the charges against Plaintiff stick. This included Snell's concealment and destruction of exculpatory evidence from the prosecutor that would have negated a finding of probable cause, including the statements made by Eiriel when she

showed up to her first interview intoxicated, as well as the fact that he observed that she was intoxicated during that interview. In fact, the prosecutor who signed the indictment against Plaintiff, Zac Selvey, admitted to Plaintiff's defense attorney that Snell never disclosed the fact of Eiriel's intoxication to him, or the "lost" recording of Snell's interview of her.

46.    Further confirming Snell's malicious and unconstitutional motive is his willful disregard of other evidence that would have been exculpatory, including the accusers' admitted statements that they were reporting Plaintiff for rape to "get money," the GPS data from Eiriel's ankle monitor, testimony from witnesses who interacted with Mariah immediately after she was allegedly raped, the surveillance footage and key card data that would have captured much of the alleged conduct and identified eyewitnesses to same, and Mariah's own sworn testimony in the related CPO proceedings that wholly contradicted both her prior statements to Snell and her trial testimony.

47.    Because the evidence on which Snell relied in submitting his charges to the prosecutor was not reasonably trustworthy, and in fact knowingly fraudulent, it could not support a finding of probable cause for the prosecution of Plaintiff for rape or sexual battery. *See Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000) ("A police officer has probable cause only when he discovers ***reasonably reliable*** information that the suspect has committed a crime[, and] in obtaining such reliable information, an officer cannot look only at the evidence of guilt while ignoring all exculpatory evidence.") (emphasis added).

48.    On January 24, 2020, a 4-count indictment was returned in the Sandusky County Court of Common Pleas, charging Plaintiff with one count of rape and one count of sexual battery against each of the complaining witnesses, Eiriel and Mariah. As a result of these falsified charges and Snell's destruction and falsification of evidence, Plaintiff was arrested, spent three months in prison, was required to post a $50,000.00 bond, and was subject to conditions of pretrial release that restricted his liberty, including an electronic monitoring device locked to his ankle, restrictions on his

freedom to travel, and regular reporting had a monitor cuffed to his ankle, and was required to regularly report to the Sandusky County pre-trial services department.

49.     On April 21, 2021, following a 3-day trial, and after only 90 minutes of deliberation, a jury completely acquitted Plaintiff on all four of the counts against him.

### V. Causes of Action

### Count 1
### Unreasonable Seizure/Malicious Prosecution
### Fourth Amendment and 42 U.S.C. § 1983

50.     Plaintiff incorporates the previous allegations by reference.

51.     This Count 1 is alleged against Defendant Snell in his personal capacity.

52.     Plaintiff had a clearly established right under the Fourth Amendment to the U.S. Constitution to be free from malicious prosecution and seizure/detention without probable cause.

53.     The actions of Detective Snell, as alleged herein, influenced the decision to initiate a criminal felony prosecution against Plaintiff for rape and sexual battery, for which there was no probable cause. Detective Snell was aware of the lack of probable cause, and the criminal proceedings against Plaintiff would not have been instituted in the first place were it not for Defendant's (1) destroying, and/or intentionally failing to preserve a videotaped interview of one of the alleged victims, (2) fabricating evidence by allowing one of the alleged victims to be coached by a biased party while being interviewed, and (3) willfully disregarding and withholding from the prosecutor other exculpatory evidence that would have negated probable cause to believe Plaintiff had committed the crimes he was charged with.

54.     By his actions alleged herein, Snell, acting under color of law, deprived Plaintiff of his right to be free from malicious and baseless prosecution that is secured to him by the Fourth Amendment and was clearly established as of September 15, 2020. *King v. Harwood*, 852 F.3d 568, 582-583 (6th Cir.2017). All of these actions caused damage to Plaintiff, including by violating his fundamental liberty interests protected by the Fourth Amendment.

13

55.     As a consequence of the legal proceedings against him, Plaintiff suffered a deprivation of liberty, including continued detention without probable cause. As a direct and proximate result of Detective Snell's unlawful conduct, which was intentional and showed a spirit of ill-will, hatred, and wanton disregard for Plaintiff's rights, Plaintiff has suffered and will continue to suffer economic and non-economic damages for which Detective Snell is liable, including, but not limited to, lost income and mental, emotional, and physical pain and suffering. Plaintiff is also entitled to punitive damages based on this unlawful and unconstitutional conduct.

### Count 2
### Fabrication/Falsification of Evidence, Due Process
### Fifth Amendment, Fourteenth Amendment, and 42 U.S.C. § 1983

56.     Plaintiff incorporates the previous allegations by reference.

57.     This Count 2 is alleged against Defendant Snell in his personal capacity.

58.     With purpose and intent, and acting under color of law or in conspiracy with those acting under color of law, Defendant Snell, who was charged with responsibility for the government's investigation of the alleged incidents between Plaintiff and his accusers, Snell fabricated, falsified, and destroyed evidence against Plaintiff knowingly and without probable cause, with the intent to deprive him of his liberty interests secured to him by the Fourth Amendment of the U.S. Constitution. These actions include Defendant's alleged (1) destruction of or intentional failure to preserve a videotaped interview of one of the alleged victims, (2) fabricating evidence by allowing one of the alleged victims to be coached by a biased party while being interviewed, and (3) willfully disregarding and withholding from the prosecutor other exculpatory evidence that would have negated probable cause to believe Plaintiff had committed the crimes he was charged with, as set forth herein, to concoct a fabricated and falsified narrative, laden with false statements, and dependent on Snell's deliberate destruction of the recording of Eiriele's initial interview.

94.     By his actions alleged herein, taken under color of law , Snell deprived Plaintiff of his right to due process of law that is secured to him by the Fifth and Fourteenth Amendments and was clearly

established as of the time of the events alleged herein. *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir.1997). All of these actions caused damage to Plaintiff, including restraint to his fundamental liberty interests as allged herein.

95.     As a direct and proximate result of this unlawful conduct, which was intentional and showed a spirit of ill-will, hatred, and wanton disregard for Plaintiff's rights, Plaintiff has suffered and will continue to suffer economic and non-economic damages for which these Defendants are liable, including, but not limited to, mental, emotional, and physical pain and suffering. Plaintiff is also entitled to punitive damages based on this unlawful and unconstitutional conduct.

**Count 3**
**Substantive Due Process Violation**
**Fourteenth Amendment and 42 U.S.C. § 1983**

59.     Plaintiff incorporates the previous allegations by reference.

60.     This Count 3 is alleged against Defendant Snell in his personal capacity.

61.     Snell had a clearly established constitutional duty to preserve and ultimately disclose to Plaintiff evidence with apparent exculpatory value.

62.     The videotaped interview of Eiriel was obviously relevant to Plaintiff's defense and clearly exculpatory. Eiriel was intoxicated during this interview and is believed to have made statements confirming that Plaintiff never raped or sexually assaulted her and that she was falsely accusing Plaintiff for financial gain. Such evidence would remove any probable cause for the charges brought against Plaintiff.

63.     With purpose and intent, and acting under color of law, Detective Snell destroyed or otherwise concealed the audio of the first interview of Eiriel with the intent to deprive Plaintiff of his liberty interests secured to him by the Fourth Amendment of the U.S. Constitution.

64.     Detective Snell's deliberate concealment and destruction of this exculpatory video evidence, as alleged herein, demonstrates egregious and conscience-shocking malice that no law immunizes against. Indeed, it establishes just the type of "conscience-shocking, arbitrary and capricious'

governmental action" that the Due Process clause of the Fourteenth Amendment protects against. *Meyers v. Cincinnati Bd. of Edn.,* 343 F. Supp. 3d 714, 725-26 (S.D. Ohio 2018), citing *Range v. Douglas,* 763 F.3d 573, 588 (6th Cir. 2014). *See also Riley v. Coutu,* 172 F.R.D. 228, 235 (E.D. Mich.1997) ("If defendant did indeed destroy plaintiff's legal materials in retaliation for plaintiff's exercise of his First Amendment rights and if that destruction did impede his access to the Courts, then such conduct is conscience-shocking and constitutes an egregious abuse of governmental power in violation of substantive due process.").

65.     Snell also engaged in a conscience shocking abuse of governmental power that deprived Plaintiff of his substantive due process when he allowed a party adverse to Plaintiff to be present during the interview of one of the alleged victims and coach her during questioning, all but ensuring the fabrication of false evidence against Plaintiff.

66.     The right to be free from such "conscience shocking, arbitrary and capricious governmental action" was clearly established at the time Snell took these actions, which he did with purpose and intent, and acting under color of law or in conspiracy with those acting under color of law.

67.     As a direct and proximate result of this conscience shocking unconstitutional conduct, which was intentional and showed a spirit of ill-will, hatred, and wanton disregard for Plaintiff's clearly established rights, Plaintiff has suffered and will continue to suffer economic and non-economic damages for which Detective Snell is liable, including, but not limited to lost income and mental, emotional, and physical pain and suffering. Plaintiff is also entitled to punitive damages based on this unlawful and unconstitutional conduct.

**Count 4**
**Unconstitutional Custom, Policy, and Practice**
**42 U.S.C. § 1983, Fourteenth Amendment, Fifth Amendment, First Amendment,**
**and *Monell v. Dept. of Social Services of the City of New York,* 436 U.S. 658 (1978)**

68.     Plaintiff incorporates the previous allegations by reference.

69.     This Count 3 is alleged against the City of Clyde, which ordered, permitted, tolerated, or

otherwise conspired to ensure the (1) concealment and destruction of the exculpatory audio of the first interview given by Eiriel and (2) the fabrication of false evidence by Mariah during a coached interview. Alternatively, the City of Clyde was deliberately indifferent to a pattern and practice whereby its officials conceal or destroy exculpatory video recordings, including where the recorded witness is shown to be intoxicated, or allows adverse parties to coach witnesses during questioning to elicit false evidence, which unduly burdens opposing parties in court proceedings.

70.     Thus, the City of Clyde, through this unconstitutional custom, policy, and practice, has deprived Plaintiff of clearly established substantive due-process rights as set forth in Count 2 above and also violated Plaintiff's clearly established First Amendment rights to free and fair access the courts. *See Graham v. Nat'l Collegiate Athletic Ass'n,* 804 F.2d 953, 959 (6th Cir. 1986).

71.     As a direct and proximate result of this unlawful and unconstitutional custom, policy, and practice, Plaintiff has suffered and will continue to suffer economic and non-economic damages for which the City of Clyde is liable, including, but not limited to, lost income and mental, emotional, and physical pain and suffering. Plaintiff is also entitled to punitive damages based on this unlawful and unconstitutional custom, policy, and practice. *See Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

### Count 5
### Spoliation of Evidence under Ohio law

72.     Plaintiff incorporates the previous allegations by reference.

73.     This Count 5 is alleged against Snell in his personal capacity.

74.     The allegations set forth herein, if proven, establish Plaintiff's right to recover against Defendants on a claim for spoliation of evidence under Ohio law.

75.     As alleged herein, Detective Snell knew there would be pending or probable criminal legal proceedings against Plaintiff. Indeed, as alleged above, Detective Snell intended to bring about such criminal proceedings.

76.     As alleged herein, Detective Snell willfully destroyed a videotaped interview with a key witness in order to influence the initiation of criminal proceedings against Plaintiff and to disrupt Plaintiff's criminal defense.

77.     Detective Snell's wrongful destruction of exculpatory evidence proximately caused Plaintiff to suffer damages, including but not limited to the need to incur additional costs, burden, and mental anguish in defending against a felony rape prosecution, which was maliciously instituted and lacked probable cause.

## VI. Prayer for Relief

Wherefore, Plaintiff respectfully prays for judgment against Defendants in an amount in excess of $75,000.00 together with punitive damages, attorneys' fees, costs, expenses, and any other relief to which Plaintiff may be entitled or that the Court deems equitable and just.

## VII. Jury Demand

Plaintiff demands a trial by jury on all issues within the Complaint.

Respectfully submitted,

*/s/ Peter Pattakos*
Peter Pattakos (0082884)
Zoran Balac (0100501)
THE PATTAKOS LAW FIRM LLC
101 Ghent Rd., Fairlawn, OH 44333
P: 330.836.8533 | F: 330.836.8536
peter@pattakoslaw.com
zbalac@pattakoslaw.com

*Attorneys for Plaintiff Cody Delgado*